# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOVANE VENCES, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 17-CV-075-GKF-JFJ ) |
| BRYAN PATINO; JOSYMAR PAREIRA; DARRELL DeSPAIN; SPENCER CRAIG, | ) ) ) ) ) |
| Defendants. | ) ) |

## OPINION AND ORDER

Plaintiff Jovane Vences, a state inmate appearing *pro se* and *in forma pauperis*, commenced this action on February 10, 2017, by filing a civil rights complaint (Dkt. # 1) against three Oklahoma Highway Patrol Troopers—Basheer Jackson, Brandon Groves, and Jared Sharpe—and four detention officers employed at the David L. Moss Criminal Justice Center (a.k.a., the Tulsa County Jail)—Josymar Pareira, Bryan Patino, Darrell DeSpain and Spencer Craig. By order filed May 30, 2018 (Dkt. # 50), the Court granted Vences' motion to dismiss Jackson, Groves, and Sharpe from this action and dismissed the complaint as to the claims alleged in Count I.

In that same order, the Court granted the motion to dismiss the complaint filed by Pareira, Patino, DeSpain and Craig (collectively, "Defendants"), in part, and dismissed Count II of the complaint to the extent it alleged Fifth and Eighth Amendment claims against them. Dkt. # 50 at 4. However, the Court liberally construed Count II of the complaint as alleging a plausible Fourteenth Amendment excessive-force claim against all four detention officers. *Id.* at 5. The Court notified the parties that it would convert Defendants' motion to dismiss to a motion for summary judgment and provided the parties time to submit any additional materials pertinent to the

motion for summary judgment. *See* Fed. R. Civ. P. 12(d); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

In response to the Court's order, Vences filed a "response to summary judgment" (Dkt. # 52). Defendants filed a "combined supplement" to their motion to dismiss (Dkt. 53) and submitted surveillance video footage from the alleged excessive-force incident (Dkt. # 54). Vences filed a "response to [the] combined supplement," along with a declaration signed under penalty of perjury (Dkt. # 55).[1] As discussed below, the Court finds that Defendants are entitled to qualified immunity and therefore grants summary judgment in their favor as to the Fourteenth Amendment excessive-force claim alleged in Count II of the complaint.

**I.**

In Count II of his complaint, Vences claims Patino, Pareira, DeSpain and Craig violated his rights under the Fourteenth Amendment while he was a pretrial detainee at the Tulsa County Jail. Dkt. # 1 at 3, 7, 9. He alleges that all four detention officers used excessive force against him around 12:30 p.m., on May 6, 2015. According to Vences, Defendants "slammed" him onto the floor of his jail cell floor and threatened to tase him. *Id.* at 9. Around 4:45 p.m., "[D]efendants conspired with

---

[1] Defendants did not submit any affidavits in response to the Court's notice that it would treat the motion to dismiss as a summary judgment motion. However, in addition to the surveillance video, they previously submitted a special report detailing the Tulsa County Sheriff's Office's investigation of the incident (Dkt. # 39). *See Martinez v. Aaron*, 570 F.2d 317, 318-19 (10th Cir. 1978) (permitting consideration of investigative reports compiled by prison officials). For purposes of this summary judgment proceeding, the Court will treat Vences' verified complaint and the special report as affidavits. *See Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir. 1992) ("On summary judgment, a *Martinez* report is treated like an affidavit, and the court is not authorized to accept its fact findings if the prisoner has presented conflicting evidence."); *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) ("[A] verified complaint may be treated as an affidavit or purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56[(c)(4)]."). In addition, the Court will consider the surveillance video and Vences' declaration.

2

male/female inmates outside [Vences'] cell to cause [him] harm/assault, and possibly cause [him] loss of life." *Id.* Vences alleges Defendants "then gave these inmates the key to the cells" and, after the inmates were unable to open his cell door, Defendants honored the inmates' request to move Vences to a more accessible cell. *Id.* According to Vences, Defendants also planned to offer him a sack lunch "in order to extract [him] from [his] cell." *Id.* Around 5:00 p.m., Defendants handed him a sack lunch and he threw it back out at them. *Id.* Defendants then threatened to tase Vences, opened the cell door, "attacked [Vences] by tasering [him] at least three times," kicked him, punched him, and placed him in leg shackles. *Id.* Vences alleges these events can be verified because Defendants' actions were captured by a video camera posted in the jail. *Id.*

As directed by the Court, the Tulsa County Sheriff's Office (TCSO) investigated the alleged excessive-force incident and submitted a special report (Dkt. # 39). That report reflects that officers with the Oklahoma Highway Patrol brought Vences to the Tulsa County Jail around 1:00 a.m. on May 6, 2015, following his arrest on suspicion of possessing a controlled substance and three traffic-related misdemeanors. Dkt. # 39 at 2-3; Dkt. # 39-3 at 1-2. During the booking process, Vences' behavior led detention officers to place him in a holding cell. Dkt. # 39 at 3. According to TCSO Policy 19-01, "if an inmate remains violent or combative [during the booking process], the inmate will be placed in a holding cell until the inmate becomes compliant." *Id.* After Vences was placed into the holding cell, he continued to display "extremely combative and menacing behavior." *Id.*

Specifically, around 5:15 a.m., while Patino and Pareira were feeding Vences, Vences grabbed the sack lunch Patino gave him and threw it back at the officers through the cuffing port. *Id.* at 3-4; Dkt. # 39-4 at 2. Pareira closed the cuffing port and Patino ordered Vences to get on the floor so the officers could place him in a different holding cell, away from other inmates. Dkt. # 39-

4 at 2. Patino warned Vences a Taser may be used against him if he did not comply. *Id.* When Vences failed to comply with Patino's orders, Patino called Craig for assistance. *Id.* Craig approached the holding cell with his Taser out. *Id.* Patino unlocked the cell door, and Craig entered the cell pointing the Taser at Vences. *Id.* Vences charged at Craig, knocking his Taser to the ground, and hit Craig in the left side of his face. Dkt. # 39-4 at 2-3. Included with the special report are still images from surveillance video footage of the incident. Those images show (1) that Vences threw his sack lunch through the cuffing port toward Patino and Pareira and (2) that Vences swung his fist at Craig when Patino opened the cell door. Dkt. # 39 at 4, 7-8. After Vences attacked Craig, the three remaining defendants, as well as other detention officers, entered the cell, grabbed Vences, and moved him to the right side of the cell. *Id.* at 2-8. During the ensuing struggle, Vences punched Patino on the right side of his face between his ear and temple "multiple times" and punched Detention Officer Theodore Humphrey in the mouth. *Id.* at 2, 10, 15. The officers were able to take Vences to the floor when DeSpain "drive stunned" Vences with his Taser.[2] *Id.* at 2-3, 7. Patino, Pareira and two other officers then placed Vences in hand and leg restraints and moved him to a different cell. *Id.* at 2-3, 7, 10; Dkt. # 39-5 at 5-6. Following the tasering incident, a nurse examined Vences and found no injuries. Dkt. # 39-5 at 6. Craig, however, sustained bruising and abrasions above the bridge of his nose and near his eye. Dkt. # 39-4 at 14-15; Dkt. # 39-5 at 4.

---

[2] "Tasers can operate in either probe mode or drive-stun mode. In probe mode, a cartridge attached to the front propels two metal probes, which are attached to the Taser by wires. The wires deliver an electrical current to incapacitate the person targeted. In drive stun mode, the Taser emits the same charge as in probe mode, but the electrical current can be delivered only by physical contact." *United States v. Quiver*, 805 F.3d 1269, 1271 n.1 (10th Cir. 2015). According to his incident report, DeSpain initially deployed his Taser in probe mode. Dkt. # 39-4 at 7. After one probe hit Detention Officer Bass, DeSpain turned off the Taser. *Id.* He then broke the probe wire and turned on the Taser, in drive-stun mode, before applying it to Vences' right-hip area. *Id.*

Surveillance video footage depicts the incident from two camera angles, one focused on the exterior of Vences' cell (Dkt. # 54, File 1) and one focused on the interior of his cell (Dkt. # 54, File 2). The video shows Patino and Pareira talking to a visibly agitated Vences and handing him a sack lunch through the cuffing port. Dkt. # 54, File 1 at 00:23-00:54, File 2 at 00:03-1:30. A second inmate appears to be sleeping on a bench in the same holding cell as Vences. *Id.*, File 2 at 00:03-1:30. The video clearly shows (1) Vences throwing his sack lunch at the officers, (2) raising his arms, gesturing toward the officers, and pacing near the cell door, (3) pounding on his cell door with both hands immediately before Patino opened the door, and (4) punching Craig as soon as Patino opened the cell door. *Id.*, File 1at 00:23-1:33, File 2 at 1:26-1:30. At least six detention officers, including all four defendants, then entered the cell in an attempt to subdue Vences. *Id.*, File 2 at 1:31-39. Vences can be seen actively resisting the officers both before and after DeSpain drive-stunned him. *Id.*, File 2 at 1:40-2:12. At least four officers, including DeSpain, Patino and Pareira, held Vences on the ground while they placed him in handcuffs and leg restraints. *Id.*, File 2 at 2:45-3:04. After he was restrained, Patino and a second officer escorted Vences to a different holding cell and removed Vences' restraints. *Id.*, File 1 at 3:18-3:22, File 2 at 3:13-3:19.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A "dispute about a material fact is 'genuine'" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material when it "might affect the outcome of the suit under the governing [substantive] law." *Id.* At the summary judgment stage,

the court's task "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249). In applying the summary judgment standard, the court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011)). However,"[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). Consistent with the plain language of Rule 56(a), the movant bears the ultimate burden to show there are no genuine issues for the jury to resolve and that the movant is entitled to judgment as a matter of law. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring).

Nonetheless, when a defendant moves for summary judgment on the basis of qualified immunity "[t]he plaintiff first must shoulder a heavy two-part burden." *Id.* at 1325. In determining whether a plaintiff has met his or her burden to show "(1) that [the] defendant violated a constitutional right and (2) that the right was clearly established, ordinarily courts must 'adopt' plaintiff's 'version of the facts.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). But at the summary judgment stage "a plaintiff's version of the facts must find support in the record." *Id.* And the court may reject plaintiff's version of the facts if it is "'so utterly discredited by the record that no reasonable jury could have believed' it." *Id.* (quoting *Scott*, 550 U.S. at 380). The court has discretion to determine "which of the two prongs of the qualified immunity analysis should be

6

addressed first," *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), "and may resolve the question by finding either requirement is not met," *Mascorro v. Billings*, 656 F.3d 1198, 1204 (10th Cir. 2011).

**III.**

Vences' sole claim is that Defendants violated his right to due process by using excessive force against him on May 6, 2015. *See* Dkt. # 1 at 9; Dkt. # 50 at 5. Because Vences was a pretrial detainee at the time of the incident, the Fourteenth Amendment's due process clause governs his claim. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015); *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010). To establish a Fourteenth Amendment violation, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473. In excessive-force cases "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Ultimately, several factors "bear on the reasonableness or unreasonableness of the force used," including, but not limited to: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* In considering these factors, courts also "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Id.* at 2474.

Here, it is undisputed that Defendants purposely and knowingly used force against Vences. All four detention officers attempted to physically restrain Vences after he punched Craig, DeSpain subdued Vences by tasering him, and Pareira and Patino placed Vences in hand and leg restraints.

7

*See supra*, pp. 3-5. However, on the record presented, no reasonable jury could find that Defendants' use of force was objectively unreasonable under the circumstances.

Vences admits, and the record demonstrates, that he threw his sack lunch at Patino and Pareira through the cuffing port of his cell and that he was behaving aggressively. Dkt. # 1 at 9; Dkt. # 39 at 3-4; Dkt. # 54, File 1 at 00:23-00:54; Dkt. # 55 at 1. The record further shows that Vences refused Patino's orders to get on the floor of his cell and punched Craig in the face as soon as Patino opened the cell door. Dkt. # 39 at 7-8, Dkt. # 39-4 at 2-3; Dkt. # 54, File 1 at 00:55-1:27, File 2 at 00:03-1:30. Then, when six detention officers entered the cell and attempted to subdue Vences, Vences repeatedly punched Patino in the head and punched a third detention officer in the mouth. Dkt. # 39-4 at 2, 10, 15; Dkt. # 54, File 2 at 1:31-1:39. Even after DeSpain drive-stunned Vences, Vences continued to actively resist the officers who were holding him down on the floor of his jail cell. Dkt. # 39-4 at 2-3, 7; Dkt. # 54, File 2 at 1:40-2:12.

Vences contends his aggression was merely a response to actions taken by Defendants and other inmates on May 6, 2015, in the hours leading up to the incident captured by the surveillance cameras. Dkt. # 1 at 9; Dkt. # 55 at 1, 3. In response to the surveillance video which supports Defendants' version of the incident, rather than his own version, Vences claims Defendants failed to provide "actual footage" of the events that led to him "being aggressive." Dkt. # 55 at 1, 3.

However, the Court has viewed the "actual footage" of Defendants' use of force against Vences on May 6, 2015. That footage and the TCSO's investigation of the incident both demonstrate that an agitated Vences threw his lunch at Patino and Pareira, punched three detention officers, and actively resisted six detention officers as they tried to restrain him to place him in isolation, away from other inmates. Regardless of whether Vences held a subjective belief that

8

Defendants were trying to lure him out of his cell with a sack lunch to be assaulted by other inmates, *see* Dkt. # 1 at 9; Dkt. # 55 at 3, any reasonable jury would find that Defendants' response to Vences' actions was objectively reasonable under the circumstances. As a result, the Court finds that Vences has not met his burden, at the first prong of the qualified-immunity analysis, to show that Defendants committed a constitutional violation. Thus, each defendant is entitled to summary judgment on the basis of qualified immunity as to the Fourteenth Amendment excessive-force claim alleged against him in Count II of the complaint.

### IV.

Because Vences failed to demonstrate that Defendants' conduct in this case violated the Fourteenth Amendment, Defendants Pareira, Patino, DeSpain and Craig are each entitled to qualified immunity as to Vences' excessive-force claim. The Court therefore grants summary judgment in Defendants' favor.

**ACCORDINGLY, IT IS HEREBY ORDERED that:**

1. The motion to dismiss filed by Defendants Pareira, Patino, DeSpain and Craig (Dkt. # 42), construed as a motion for summary judgment (Dkt. # 56), is **granted** on the basis of qualified immunity.

2. A separate judgment shall be entered in this matter.

   **DATED** this 13th day of August 2018.

   *[signature]*
   GREGORY K. FRIZZELL, CHIEF JUDGE